# Exhibit A

2020 WL 415811
Only the Westlaw citation is currently available.
United States Court of Appeals, Eleventh Circuit.

Melanie GLASSER, Plaintiff-Appellant,

v.

HILTON GRAND VACATIONS COMPANY, LLC, Defendant-Appellee.

Tabitha Evans, Plaintiff-Appellee,

v.

Pennsylvania Higher Education Assistance Agency, Defendant-Appellant.

No. 18-14499, No. 18-14586
|
(January 27, 2020)

**Attorneys and Law Firms**

Amanda J. Allen, William Peerce Howard, The Consumer Protection Firm, Tampa, FL, Keith J. Keogh, Timothy J. Sostrin, Keogh Law, LTD, Chicago, IL, for Plaintiff-Appellant in 18-14499.

Angela Christine Agrusa, David Farkas, DLA Piper LLP (US), Los Angeles, CA, Fredrick H. L. McClure, DLA Piper LLP (US), Tampa, FL, Shay Dvoretzky, Jones Day, Washington, DC, Ernest H. Kohlmyer, III, Shepard Smith Kohlmyer & Hand, PA, Maitland, FL, for Defendant-Appellee in 18-14499.

Scott D. Owens, Scott D. Owens, PA, Hollywood, FL, for Amici Curiae National Association of Consumer Advocates, and Consumer Federation of America in 18-14499.

Geoffrey E. Parmer, Dogali Law Group, PA, Tampa, FL, for Service in 18-14499.

Megan S. Ben'Ary, McGlinchey Stafford, Washington, DC, for Amicus Curiae ACA International in 18-14499.

Adam Theodore Hill, The Law Offices of Jeffrey Lohman, PC, Corona, CA, Judith Delus Montgomery, The Law Office of Judith Delus, PA, Decatur, GA, for Plaintiff-Appellee in 18-14586.

Derin Bronson Dickerson, Gerald L. Mize, Jr., Tejas S. Patel, Alston & Bird, LLP, Atlanta, GA, for Defendant-Appellant in 18-14586.

Tara A. Twomey, National Consumer Bankruptcy Rights Center, Carmel, CA, for Amici Curiae Consumer Federation of America, National Association of Consumer Advocates, and National Consumer Law Center in 18-14586.

Appeal from the United States District Court for the Middle District of Florida, D.C. Docket No 8:16-cv-00952-JDW-AAS

Appeal from the United States District Court for the Northern District of Georgia, D.C. Docket No. 3:16-cv-00082-TCB

Before WILLIAM PRYOR, MARTIN, and SUTTON,[*] Circuit Judges.

**Opinion**

SUTTON, Circuit Judge:

 ***1**  After they each received over a dozen unsolicited phone calls, some about repaying a debt, others about buying vacation properties, Melanie Glasser and Tabitha Evans sued the companies that called them for violating the Telephone Consumer

Protection Act. Both women allege that the companies placed the calls through "Automatic Telephone Dialing Systems," which the Act regulates and restricts. Because neither phone system used randomly or sequentially generated numbers and because the phone system in Glasser's appeal required human intervention and thus was not an auto-dialer, the Act does not cover them.

**I.**

In 1991, Congress enacted the Telephone Consumer Protection Act. Pub. L. No. 102-243, 105 Stat. 2394. The law makes it illegal to "make any call ... using any automatic telephone dialing system or an artificial or prerecorded voice" to "emergency telephone line[s]," to "guest room[s] or patient room[s] of a hospital," or "to any telephone number assigned to a paging service[ ] or cellular telephone service" without the "prior express consent of the called party." 47 U.S.C. § 227(b)(1)(A). It defines an "automatic telephone dialing system" as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." Id. § 227(a)(1). The law's prohibition on using auto-dialers does not apply to residential land lines. Id. § 227(b)(1)(B). The Act enforces these requirements with penalties, including $500 for each illegal call. Id. § 227(b)(3)(B). If the caller "willfully" or "knowingly" violated the prohibition, the court may award $1,500 or more per call. Id. § 227(b)(3).

Melanie Glasser and Tabitha Evans entered the picture in 2013. Over the course of about a year, they each received over a dozen unsolicited phone calls to their cell phones. Hilton Grand Vacations Company, LLC, a timeshare marketer, called Glasser thirteen times about vacation opportunities. The Pennsylvania Higher Education Assistance Agency, a loan servicer, called Evans thirty-five times about unpaid student loans. Neither Glasser nor Evans consented to the calls.

The plaintiffs alleged that the companies used "automatic telephone dialing system[s]," often referred to as auto-dialers, in violation of the Act. The companies admitted that they called the plaintiffs, and they admitted that they used sophisticated telephone equipment to make the calls. But they disputed that their systems counted as auto-dialers under the Act. In Glasser's case, the district court concluded that the system did not qualify as an auto-dialer because it required human intervention to dial the telephone numbers. In Evans' case, the court concluded that the system qualified as an auto-dialer because it did not require human intervention and had the capacity to dial automatically a stored list of telephone numbers. The court also ruled that the Agency willfully violated the Act for thirteen of the calls that it made to Evans because those calls used an artificial or prerecorded voice, a separate means of violating the Act. The court accordingly awarded treble damages for those calls. Glasser and the Agency appealed.

**II.**

**\*2** A brief word or two about jurisdiction is in order before we turn to the merits of these consolidated appeals. The U.S. Constitution empowers the federal courts to decide "Cases" or "Controversies." To ensure that a plaintiff has standing to bring such a claim, we ask whether the plaintiff (1) alleged a concrete injury (2) that's traceable to the defendant's conduct and (3) that the courts can redress. Lujan v. Defs. of Wildlife, 504 U.S. 555, 559–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

The only tricky issue is whether these unwanted phone calls amount to concrete injuries. That Congress called them injuries and awarded damages for them does not end the inquiry. Congress "cannot erase Article III's standing requirements" by granting a plaintiff "who would not otherwise have standing" the right to sue via statute. Spokeo, Inc. v. Robins, ––– U.S. ––––, 136 S. Ct. 1540, 1547–48, 194 L.Ed.2d 635 (2016) (quotation omitted). A real injury remains necessary. But a recent decision, as it happens, resolves the point for the plaintiffs. "The receipt of more than one unwanted telemarketing call," the court concluded, "is a concrete injury that meets the minimum requirements of Article III standing." Cordoba v. DIRECTV, LLC, 942 F.3d 1259, 1270 (11th Cir. 2019). We appreciate that the point is close, as another decision of the court suggests. See Salcedo v. Hanna, 936 F.3d 1162, 1168 (11th Cir. 2019). But Cordoba resolves it, establishing an Article III injury and giving plaintiffs standing to bring these claims.

**III.**

Section 227(a)(1) of the Act defines an "automatic telephone dialing system" as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." Remember these words.

**A.**

The first question is what to do with the clause: "using a random or sequential number generator." Does it modify both verbs ("to store" and "[to] produce") or just one of them ("[to] produce" but not "to store")?

As Hilton and the Agency see it, the clause modifies both verbs. Thus: to be an auto-dialer, the equipment must (1) store telephone numbers using a random or sequential number generator and dial them or (2) produce such numbers using a random or sequential number generator and dial them. Because the equipment used in the debt-collection calls targeted a list of debtors (like Evans) and the equipment used in the solicitation calls targeted individuals likely to be interested in buying vacation properties (like Glasser), they say that the statute does not apply to their calls.

As Evans and Glasser see it, the clause just modifies "[to] produce." Thus: to be an auto-dialer, the equipment must (1) store telephone numbers and dial them or (2) produce such numbers using a random or sequential number generator and dial them. Under this reading, the statute extends to phone calls that target a pre-existing list of prospects or debtors, even though they were not randomly or sequentially identified.

Clarity, we lament, does not leap off this page of the U.S. Code. Each interpretation runs into hurdles. In the absence of an ideal option, we pick the better option—in this instance that the clause modifies both verbs.

Start with conventional rules of grammar and punctuation. When two conjoined verbs ("to store or produce") share a direct object ("telephone numbers to be called"), a modifier following that object ("using a random or sequential number generator") customarily modifies both verbs. Consider these examples to see the point. In the sentence, "Appellate courts reverse or affirm district court decisions using the precedents at hand," no one would think that the appellate judges rely on precedents only when affirming trial judges. Or if a law gives tax preferences for "[a] corporation or partnership registered in Delaware," then "a corporation as well as a partnership must be registered in Delaware" in order to be eligible for the preference. Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*, 148 (2012). The same principle applies here. *See also [Am. Nat'l Fire Ins. Co. v. Rose Acre Farms, Inc.](), 107 F.3d 451, 456–57 (7th Cir. 1997).*

**\*3** On top of that, the sentence contains a comma separating the phrase "to store or produce telephone numbers to be called" from the phrase "using a random or sequential number generator." That, too, indicates that the clause modifies both "store" and "produce" and does not modify just the second verb. *See* Scalia & Garner, *Reading Law* at 150. *See also [Osorio v. State Farm Bank, F.S.B.](), 746 F.3d 1242, 1257 (11th Cir. 2014); [Yang v. Majestic Blue Fisheries, LLC](), 876 F.3d 996, 999–1000 (9th Cir. 2017)* (collecting cases).

The content of the words takes us in the same direction, though with two hiccups along the way. The first hiccup is the oddity of "stor[ing]" telephone numbers using a number generator. But this problem fades when one considers how automatic phone-dialing technology works and when one keeps in mind the goal of giving content to each word and phrase in the statute. *[Russello v. United States](), 464 U.S. 16, 23–24, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983).* The key reality is that it is difficult to think of dialing equipment that can "produce" telephone numbers and "dial" them but lacks the "capacity" to "store" them. Somewhere between identification and production, storage occurs. In that way, a device "stores" telephone numbers "using" a random or sequential number generator because the device employs the number generator as part of the storage process. The near impossibility that such equipment would not "store" phone numbers leads to another clue. The key modifier ("using a random or sequential number generator") would rarely, if ever, make a difference under the plaintiffs' approach. If all you need to show is storing and calling, that would apply to the "capacity" of nearly every piece of equipment, whether designed to produce randomly generated numbers or not. Helping matters is the fact that devices that randomly generated phone numbers and stored them existed at the

time Congress passed the Act. *See Noble Systems Corp.*, *Comments on FCC's Request for Comments on the Interpretation of the TCPA*, 12–13 (Oct. 16, 2018) FCC DA 18-493.

That brings us to the second hiccup. If a device that produces telephone numbers *necessarily* stores them, that creates another problem, one of superfluity. *See Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386, 133 S.Ct. 1166, 185 L.Ed.2d 242 (2013). What role does that leave for "store" to play? Three answers, none perfect, appear. One is that, in the context of this kind of technology, "produce" and "store" operate more as doublets than independent elements. Scalia & Garner, *Reading Law* at 176–77. Another is that both interpretations on the table run into superfluity problems. And we prefer the least superfluous approach—one that acknowledges some redundancy between store and produce but does not read a key clause ("using a random or sequential number generator") out of the statute.

One last point turns on history. The regulatory record confirms that, at the time of enactment, devices existed that could randomly or sequentially create telephone numbers and (1) make them available for immediate dialing or (2) make them available for later dialing. *See Noble Systems Corp. Comments* at 13. Sometimes storage would happen; sometimes it wouldn't. Under this reading, § 227(a) occupied the waterfront, covering devices that randomly or sequentially generated telephone numbers and dialed those numbers, or stored them for later dialing.

**\*4** The context in which these words appear cuts in the same direction. Think about the types of calls the Act seeks to prohibit. Section 227(b)(1) makes it unlawful to use an auto-dialer or an artificial or prerecorded voice to call "any emergency telephone line" including "any '911' line." 47 U.S.C. § 227(b)(1)(A)(i). It suspends belief to think that Congress passed the law to stop telemarketers from *intentionally* calling 911 operators and playing them a prerecorded message. Congress instead passed the law to prevent callers from accidentally reaching 911 lines by dialing randomly or sequentially generated telephone numbers—a concern raised in the legislative debates. *See Computerized Telephone Sales Calls & 900 Service: Hearing Before the Senate Comm. on Commerce, Science & Transp.*, 102d Congress 34–35 (1991) (Statement of Chuck Whitehead) ("[T]hese automated dialers dial 911, they dial all of our emergency numbers .... it delays the response of emergency services."). So too for the Act's prohibition on calls to the "guest room or patient room of a hospital." *Id.* at § 227(b)(1)(A)(ii).

Contemporaneous understanding supports this interpretation as well. Everyone seemed to accept this interpretation for the first dozen years of the statute's existence. The Federal Communications Commission, the agency that administers the Act, shared this view after the Act's passage. In a 1992 declaratory order, the Commission explained that certain technologies would not qualify as auto-dialers under the Act because the numbers these devices called "are not generated in a random or sequential fashion"—a baseline for all covered calls. *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 7 FCC Rcd. 8752, 8776 (1992). The agency did not alter its view in 1995, saying that it did not cover calls "directed to ... specifically programmed contact numbers," only to those "randomly or sequentially generated telephone numbers." *In re TCPA Rules & Regulations*, 10 FCC Rcd. 12391, 12400 (1995). The "random or sequential" requirement, thought the Commission, modified produce and store. The law did not cover devices that merely stored numbers and called them later. From 1991 to 2003, this perspective prevailed. The plaintiffs have not identified any court from that era that took the view that the law covered devices that merely stored numbers and called them later. What litigation there was focused on the Act's constitutionality, its relationship to state law, and its ban on junk faxes. *See, e.g.*, *Destination Ventures, Ltd. v. FCC*, 46 F.3d 54, 55–56 (9th Cir. 1995); *Van Bergen v. Minnesota*, 59 F.3d 1541, 1547–49 (8th Cir. 1995); *Texas v. American Blastfax, Inc.*, 121 F. Supp. 2d 1085, 1087–93 (W.D. Tex. 2000); *Szefczek v. Hillsborough Beacon*, 286 N.J.Super. 247, 668 A.2d 1099, 1102–1109 (1995).

Not until 2003 did this common understanding dissipate. That year, the Commission issued a new order that interpreted § 227 to extend to equipment that merely dialed numbers "from a database of numbers"—that merely stored numbers and called them. *In re TCPA Rules & Regulations*, 18 FCC Rcd. 14014, 14091 (2003). This new take on § 227's coverage, and its expansion of that coverage, sparked litigation over the meaning of an auto-dialer. *See Satterfield v. Simon & Schuster*, No. C 06-2893 CW, 2007 WL 1839807 at \*4–5 (N.D. Cal. June 26, 2007), *rev'd*, 569 F.3d 946 (9th Cir. 2009); *Hicks v. Client Servs., Inc.*, No. 07-61822-CIV, 2009 WL 2365637 at \*5–6 (S.D. Fla. June 9, 2009).

What changed? Technology and marketing strategies. But not the statute. Before it tried to pour new wine into this old skin, the Commission had watched companies switch from using machines that dialed a high volume of randomly or sequentially generated numbers to using "predictive dialers" that called a list of pre-determined potential customers. 18 FCC Rcd. at 14090–91. The shift in practice was understandable. Why call random telephone numbers when you could target the consumers who showed an interest in your product or actually owed a debt? But it didn't mean fewer calls. The Commission estimated that telemarketers attempted 104 million calls a day in 2002, compared to 18 million in 1991. *In re TCPA Rules & Regulations*, 17 FCC Rcd. 17459, 17464 (2002). Concerned that technological innovation might defeat the purpose of the Act, the Commission invited commentators to weigh in on "whether Congress intended the definition of 'automatic telephone dialing system' to be broad enough to include any equipment that dials numbers ... from a database of existing telephone numbers." *Id.* at 17474.

**\*5** Congress in retrospect drafted the 1991 law for the moment but not for the duration. The focus on number generation eradicated one form of pernicious telemarketing but failed to account for how business needs and technology would evolve. Watching this happen in real time, the Commission tried to use a broad "reading of the legislative history" and an all-encompassing view of the law's purpose to expand the statute's coverage and fill this gap. *Id.*

The D.C. Circuit in large part rejected this interpretation and the Commission's like-minded 2008 rulemaking efforts as well. *ACA Int'l v. FCC*, 885 F.3d 687, 702–703 (D.C. Cir. 2018). The Commission, the court found, had been talking out of both sides of its mouth when it came to defining an auto-dialer. *Id.* In a 2015 order (meant to clarify the agency's position), the Commission had affirmed its initial view, that auto-dialers *must* generate random or sequential numbers, but also its revision that devices *may* count if they dial numbers from a stored list. *Id.* To "espouse ... competing interpretations in the same order," the court held, was arbitrary and capricious and required vacating the Commission's orders. *Id* at 703.

At the same time, the court expressed skepticism about a different interpretive question that bears on this case. Besides "clarify[ing]" the definition of an auto-dialer, the Commission had decided that the word "capacity" in § 227 meant "potential." *Id.* at 695–98. Any device that could be modified to perform the functions of an auto-dialer, even a rotary telephone, now counted under the Act. *Id.* at 700. The D.C. Circuit rejected this far-reaching interpretation because it brought "within the definition's fold [smartphones,] the most ubiquitous type of phone equipment known." *Id.* at 698.

We share the D.C. Circuit's concern. In recognizing that the Commission's efforts to fill a legislative gap in coverage created by new communication technology would create an administrative expansion of coverage that extended to all communication technology, the court identified a problem that applies just as forcefully to the definition of an auto-dialer's functions as it does to the definition of capacity. In the age of smartphones, it's hard to think of a phone that does not have the capacity to automatically dial telephone numbers stored in a list, giving § 227 an "eye-popping" sweep. *Id.* at 697. Suddenly an unsolicited call using voice activated software (think Siri, Cortana, Alexa) or an automatic "I'm driving" text message could be a violation worth $500. 47 U.S.C. § 227(c)(5)(B). Not everyone is a telemarketer, not even in America. One would not expect to find this exponential expansion of coverage in a law targeting auto-dialers and randomly generated numbers—an expansion by the way that would moot much of the Fair Debt Collection Act's application to telephone debt collection efforts. See *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001).

Constitutional avoidance principles also support our interpretation. Would the First Amendment really allow Congress to punish every unsolicited call to a cell phone? That is a G too far. See *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 501, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996). And how could it be consistent with the First Amendment to make exceptions for calls with a specific content, such as the exception for calls about government debts? 47 U.S.C. § 227(b)(1)(A)(iii); *Duguid v. Facebook, Inc.*, 926 F.3d 1146, 1152–56 (9th Cir. 2019); *Am. Ass'n of Political Consultants, Inc. v. FCC*, 923 F.3d 159, 169–171 (4th Cir. 2019), cert. granted, ––– U.S. ––––, ––– S.Ct. ––––, ––– L.Ed.2d ––––, No. 19–631 2020 WL 113070 (Jan. 10, 2020); see generally *Clark v. Martinez*, 543 U.S. 371, 381–82, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005).

**\*6** We are not alone in adopting this interpretation. Several other courts agree. *Dominguez v. Yahoo, Inc.*, 894 F.3d 116, 119 (3d Cir. 2018); *DeNova v. Ocwen Loan Servicing*, No. 8:17-cv-2204-T-23AAS, 2019 WL 4635552 at \*3–4 (M.D. Fla. Sept. 24,

2019); *Adams v. Safe Home Sec. Inc.*, No. 3:18-cv-03098-M, 2019 WL 3428776 at *3–4 (N.D. Tex. July 30, 2019); *Gadelhak v. AT&T Servs., Inc.*, No. 17-cv-01559, 2019 WL 1429346 at *5–6 (N.D. Ill. Mar. 29, 2019); *Keyes v. Ocwen Loan Servicing, LLC*, 335 F. Supp. 3d 951, 962–63 (E.D. Mich. 2018).

Evans and Glasser resist this conclusion on several grounds. They insist that we must follow the Commission's interpretation, adopted in the 2003 and affirmed in 2008. Why? A different law, the administrative Hobbs Act, requires any challenge to an agency decision, like these orders, to go through a specific process not used here. *See Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, 1049 (9th Cir. 2018). Since the time for that type of review has passed, they say, the Commission's rulings govern our application of the statute. But they do not come to grips with the reality that the D.C. Circuit, in a Hobbs Act proceeding of its own, wiped the slate clean. *ACA Int'l*, 885 F.3d at 703; *Marks*, 904 F.3d at 1049–50; *Dominguez*, 894 F.3d at 119; *Pinkus v. Sirius XM Radio Inc.*, 319 F. Supp. 3d 927, 932–35 (N.D. Ill. 2018) (collecting cases). The court reviewed the relevant parts of the orders and "set aside the Commission's treatment of those matters." *ACA Int'l* 885 F.3d at 703.

Also unpersuasive is the contention that Congress "ratified" the Commission's expansive interpretation when it amended § 227 in 2015. That is an odd thing to say about a reading of the statute that the D.C. Circuit described as "[in]consistent with reasoned decisionmaking"—and was issued nearly four months before the amendment. *Id.* at 703; *In re TCPA Rules & Regulations*, 30 FCC Rcd. 7961 (2015); Pub. L. 114-74 § 301, 129 Stat 584 (2015). This principle of statutory interpretation at any rate carries weight only "[w]hen Congress reenacts statutory language that has been given a consistent judicial construction." *Cent. Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 185, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). Any consistency runs away from what Congress purportedly ratified, particularly if one factors in the first dozen years of the courts' and agency's experience with the statute. One thing more. The 2015 amendment did not reenact § 227's definition of an auto-dialer; it added to § 227's liability provision, Pub. L. 114-74 § 301, 129 Stat 584 (2015)—a change that has nothing to do with this debate. No circuit court to our knowledge has accepted this argument. Many have rejected it. *See, e.g., Osthus v. Whitesell Corp.*, 639 F.3d 841, 853 (8th Cir. 2011); *Paralyzed Veterans of Am. v. Sec'y of Veterans Affairs*, 345 F.3d 1334, 1351–52 (Fed. Cir. 2003); *Gen. Am. Transp. Corp. v. Interstate Commerce Comm.*, 872 F.2d 1048, 1053 (D.C. Cir. 1989); *accord VMG Salsoul, LLC v. Ciccone*, 824 F.3d 871, 886–87 (9th Cir. 2016).

More profitably, but not profitably enough, Evans and Glasser invoke the Ninth Circuit's decision on the merits in *Marks*, a thoughtful opinion by Judge Ikuta. The court construed § 227 to cover devices with the capacity to automatically dial telephone numbers from a stored list or to dial telephone numbers produced from a random or sequential number generator. 904 F.3d at 1050–53. We appreciate, as shown, a key source of the court's hesitation—the instinct against "using a random or sequential number generator" to "store" telephone numbers. *Id.* at 1050–51. But this approach creates problems of its own, as we have also shown. To adopt this reading, one must separate the statute's two verbs ("to store or produce"), place the verbs' shared object ("telephone numbers to be called") in between those verbs, then insert a copy of that shared object to the statute, this time after the now separate verb "to produce" to make clear that "using a random or sequential number generator" modifies only "to produce." That looks more like "surgery," in the words of Hilton, than interpretation. Br. 35.

**\*7** Evans and Glasser assure us that, if we just apply the last antecedent canon to § 227, their reading follows. But this ignores an exception to the canon. If a comma separates a modifier ("using a random or sequential number generator") from multiple antecedents ("to store or produce telephone numbers to be called"), the modifier alters both antecedents. *Yang*, 876 F.3d at 1000 & n.3 (collecting cases). Besides, even if the canon applied, the "last antecedent" is not "to produce" but is "telephone numbers to be called." Neither the plaintiffs nor the Ninth Circuit explain why we should read the statute as they do when it's just as plausible that an auto-*dialer* refers to a device that randomizes or sequences a dialing order.

The legislative history identified by Evans and Glasser gives us new mountains to climb but no new scenery to view. The cited excerpt says nothing about what Congress thought of the meaning of an auto-dialer. If anything, the legislative history hurts Evans and Glasser, as there is plenty of evidence that Congress wanted the statute to eradicate machines that dialed randomly or sequentially generated numbers. That indeed seems to have been the be-all and end-all of the law. *See, e.g.*, H.R. 1304 &

1305, *Hearing Before the Subcomm. On Telecomms. & Fin. of the H. Comm. on Energy & Commerce*, 102d Cong. 1 (1991) (statement of Chairman Edward J. Markey).

Evans and Glasser say our interpretation makes hash of several exemptions in the statute. Why would the statute exempt calls to consenting recipients from liability if the statute covers just randomly or sequentially generated numbers? See 47 U.S.C. § 227(b)(1). (There are not likely to be a lot of consented-to calls from randomly generated numbers.) And why would anyone ever use an auto-dialer to call people about a debt owed to the federal government, another exemption from liability? *Id.* (Debt collection usually involves non-randomly identified people.) Good questions both. But they submit to shared answers. Recall that § 227(b)(1) makes callers liable if they make calls "using an automatic telephone dialing system *or an artificial or prerecorded voice*." *Id.* (emphasis added). This alternative basis for liability covers every exemption the plaintiffs worry about. The statute, moreover, applies to devices that have the "capacity" to identify randomly generated numbers; it does not require that capacity to be used in every covered call.

Evans and Glasser persist that, if we do not interpret § 227 to prohibit devices that automatically call a stored list of numbers, nothing will stand in the way of telemarketers who wish to inundate citizens with solicitations and scams. Not true. The Act's prohibition on artificial or prerecorded voices means that telemarketers who dial lists of telephone numbers have three options. They may obtain consumers' consent to robocalls. They may connect each potential customer with a human representative. Or they may face liability under the Act. That's a fair balancing of commercial and consumer interests—one Congress is free to revisit but hardly one that is implausible.

**B.**
Glasser's lawsuit raises another problem: The telephone equipment in her case required human intervention and thus was not an "automatic" dialing system in the first place. Even if the statute covers devices that can automatically dial a stored list of non-randomly generated numbers, Hilton's device still would not qualify. Keep in mind that the system requires a human's involvement before it places any calls. Glasser R.132 at 10–11 ("[I]t is undisputed that calls cannot be made unless an agent ... forwards a telephone number to the server to be called."). This reality cannot be squared with the accepted assumption that auto-dialers must *automatically* dial the numbers.

 *8  Consider the details of Hilton's system: Intelligent Mobile Connect. Each week, a Hilton marketing team creates a set of parameters about whom they want sales agents to contact. The team programs the system with these criteria, and the system selects customer records that fit the bill. The system then sends these numbers to Hilton employees who review the telephone numbers in a computer application. On their screens, the employees see a telephone number and button labeled "make call." Unless and until the employee presses this button, no call goes out. Once the button is pressed, the system dials the number and connects anyone who answers with a sales agent. Far from automatically dialing phone numbers, this system requires a human's involvement to do everything except press the numbers on a phone.

Glasser does not deny that humans play this role in placing calls. And she does not deny that the statute extends only to "automatic," not human dialing. She instead deems the human tasks associated with these systems so immaterial that they should not matter to our analysis of whether the device automatically dials numbers or not. But this system demands far more from its human operators than just "turning on the machine or initiating its functions," *Marks*, 904 F.3d at 1052–53, steps we agree would occur before an auto-dialer begins operating. The technology before us requires meaningful human interaction to dial telephone numbers: An employee's choice initiates every call. Yes, the system dials the numbers itself. But no one would think that telling a smartphone to dial the phone number of a stored contact (or several contacts) means the smartphone has automatically dialed the number. Human intervention is necessary there, just as it is here, to initiate the call.

**IV.**
Our interpretation of § 227 resolves Glasser's case and most of Evans' case. All that's left are a few concerns the Agency has about the district court's decision to award Evans treble damages for thirteen of the thirty-five calls she received.

For this subset, the court concluded that the Agency used an artificial or prerecorded voice to contact Evans. Remember that using recordings to call someone without her consent is an independent basis for liability under the Act. 47 U.S.C. § 227(b)(1)(A). Our preceding discussion about auto-dialers, then, doesn't bear on this ruling. Nor does it matter for the district court's other decisions, including its decision that the Agency's use of recordings amounted to a willful violation of the Act and warranted treble damages.

A district court may grant summary judgment to a party when "there is no genuine dispute as to any material fact" and the party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We review such decisions with fresh eyes. *Newcomb v. Spring Creek Cooler Inc.*, 926 F.3d 709, 713 (11th Cir. 2019).

No error occurred. Even taking the evidence in "a light most favorable" to the Agency, all the facts point towards its use of recorded messages. *Id.* First off, the Agency does not deny that it called Evans. And each of the thirteen calls she received came from the same number, a number the Agency admittedly owns. Looking at the transcripts of these calls, they all bear the hallmark of a recording—an identical message. Each concludes with the same phrase: "Again, our number is [Telephone Number]." Evans R.35-3 at 4–8. Evans also managed to show that the Agency's call log matches her own, down to the minute. Every record bears the same notation: "Left Answering Machine Message." Evans R.30-14 at 4–43. Taken together, there's more than enough to conclude the Agency used a recording to contact Evans thirteen times.

The Agency responds that we should not consider Evans' evidence of the recordings because she failed to properly authenticate her submissions. But the Agency failed to raise the point below. It fails anyway. The Agency claims that Evans needed to submit an affidavit along with her evidence, but the Federal Rules eliminated that requirement ten years ago. *See* Fed. R. Civ. P. 56(c); Fed. R. Civ. P. 56 advisory committee's note to 2010 amendment; Charles Alan Wright et al. 10A *Federal Practice and Procedure* § 2722 at 396–401 (4th ed. 2016). Evans met her authentication burden when she offered testimony to support her submissions. *See In re Int'l Mgmt. Assocs., LLC*, 781 F.3d 1262, 1267 (11th Cir. 2015).

**\*9** As for the court's conclusion that the Agency willfully violated the Act, we see no error there either. The Agency admitted Evans contacted a representative and revoked her consent to be called. Despite this interaction, the record shows the Agency kept contacting Evans and kept playing her recordings. The Agency knowingly used prohibited technology to contact someone it knew had revoked her consent. That's a willful violation of the Act. *See Lary v. Trinity Physician Finan. & Ins. Servs.*, 780 F.3d 1101, 1107 (11th Cir. 2015).

The Agency offers no good reason why we should see it differently. It instead repeats its arguments about the court's decision on Evans' evidence, claiming that the "error" causes problems far downstream. But the district court made no mistake when it considered her evidence, leaving the Agency without a leg to stand on.

**V.**
We **AFFIRM** the judgment in Glasser's case and **AFFIRM IN PART** and **REVERSE IN PART** the judgment in Evans' case.

MARTIN, Circuit Judge, concurring in part and dissenting in part:
As I read the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, the system used by the Pennsylvania Higher Education Assistance Agency ("PHEAA") to make 35 calls to Tabitha Evans qualified as an automatic telephone dialing system ("autodialer" or "ATDS"). I therefore respectfully dissent from the majority's reversal of the grant of summary judgment to Ms. Evans. I agree with the majority opinion in all other respects.

**I.**

The TCPA defines an autodialer as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." Id. § 227(a)(1). Construing this provision, the majority holds that a device qualifies as an autodialer only if it can "(1) store telephone numbers using a random or sequential number generator and dial them or (2) produce such numbers using a random or sequential number generator and dial them." Maj. Op. at ——. I think this interpretation is mistaken. I do not read the statute to require that a device must randomly or sequentially generate numbers in order to qualify as an autodialer. Rather, I understand that a machine may qualify as an autodialer based solely on its ability to store numbers.

A. THE APPROACH TAKEN BY THE MAJORITY AND PHEAA RELIES ON AN IMPLAUSIBLE DEFINITION OF "STORE."

I will start by accepting the premise of the majority opinion that the phrase "using a random or sequential number generator" does not modify only the word "produce." [1] See Maj. Op. at —— – ——. The statutory language in question then reads as follows: "the capacity to store ... telephone numbers to be called, using a random or sequential number generator." The majority apparently reads this provision to mean that a device must have the capacity to store telephone numbers using a random or sequential number generator. See Maj. Op. at —— – ——. Indeed, the majority opinion says that the text of the statute compels this result.

It must be said that the language of this prong of the TCPA makes little sense. For example, how does it happen that telephone numbers can be stored by way of a random or sequential number generator? The majority's construction of § 227(a)(1) requires this. Yet the only function we really know to be performed by a random or sequential number generator is that it generates numbers. I appreciate the majority's candor in recognizing "the oddity of 'stor[ing]' telephone numbers using a random number generator." Maj. Op. at —— (alteration in original). But it never explains how numbers are actually stored "using" a random or sequential number generator.

 *10  PHEAA prevails on appeal because the majority adopts a tortured definition of "store." Under the majority's interpretation of the TCPA, storage using a random or sequential number generator is something that happens whenever a number is generated, regardless of whether it is dialed immediately or saved for later. See Maj. Op. at —— ("The key reality is that it is difficult to think of dialing equipment that can 'produce' telephone numbers and 'dial' them but lacks the 'capacity' to 'store' them. Somewhere between identification and production, storage occurs."). [2] But from when the TCPA was enacted through today, "store" has meant "[t]o reserve or put away for future use." American Heritage Dictionary (5th ed. 2020), https://ahdictionary.com/word/search.html?q=store; see also Webster's New International Dictionary 2252 (3d ed. 1993) (defining "store" to mean "to record (information) in an electronic device (as a computer) from which the data can be obtained as needed"). So I read the majority's approach as distorting "store" beyond its plain and ordinary meaning. For example, when I hand my credit card to a cashier, he does not "store" it. The cashier may briefly hold my card, but he does not intend to retain it indefinitely and does not need it for later use. Yet under the majority's interpretation, the cashier's brief handling of my card would be an instance of "storage."

I do not think "store ... using a random or sequential number generator" means, as the majority opinion posits, that a "device employs [a] number generator as part of the storage process," a process that supposedly occurs every time a number generator is used. See Maj. Op. at ——. The Court would be better off acknowledging that "store ... using a random or sequential number generator" does not make sense, and thus avoiding the gymnastics required to give meaning to this phrase.

B. MS. EVANS'S APPROACH AVOIDS SURPLUSAGE AND MAKES SENSE IN THE CONTEXT OF THE STATUTE.

In order to reach the same outcome without giving "store" an implausible meaning, the majority could add words to define ATDS as "equipment which has the capacity (A) to store [telephone numbers produced using a random or sequential number generator] or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." See Marks v. Crunch San Diego, LLC, 904 F.3d 1041, 1050–51 (9th Cir. 2018), petition for cert. dismissed, ––– U.S.

----, 139 S. Ct. 1289, 203 L.Ed.2d 300 (2019). Indeed, Ms. Evans's approach also requires adding words to the statute to define ATDS as "equipment which has the capacity (A) to [i] store [telephone numbers to be called] or [ii] produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." See id. at 1050. Under either approach, there is a recognition of the ambiguity of the statutory text. See id. at 1051. But I believe Ms. Evans's interpretation should prevail on the grounds that it avoids surplusage, harmonizes the challenged language with other aspects of the TCPA, and aligns with the Ninth Circuit's approach in Marks.

1. Surplusage

Under either way of looking at the majority's approach—whether through the majority's above-discussed interpretation of "store" or through the addition of words to the TCPA to avoid interpreting "store" in an anomalous fashion—"storage" happens any time a device randomly or sequentially generates a number. As the majority admits, this interpretation "run[s] into superfluity problems." Maj. Op. at ——. After all, what work is there for the "produce" prong of the ATDS definition to do now? That is to say, I see no difference between randomly or sequentially generating a number incidental to storage on the one hand, and "produc[ing] telephone numbers to be called, using a random or sequential number generator," § 227(a)(1), on the other.

The majority recognizes this shortcoming but excuses the problem by saying its approach is the "least superfluous" one. Maj. Op. at ——. Not so. There is no surplusage problem if one reads the statute to say that an autodialer must either (1) store telephone numbers, or (2) produce telephone numbers using a number generator. Because we may not "needlessly read[ ] a statute in a way that renders ... certain language superfluous," this point supports Ms. Evans's argument. See Barton v. U.S. Att'y Gen., 904 F.3d 1294, 1300 (11th Cir. 2018).

2. Statutory Context

 *11  The approach preferred by PHEAA and the majority also renders certain aspects of the TCPA's substantive reach nonsensical. For example, the TCPA permits calls using an autodialer "made solely to collect a debt owed to or guaranteed by the United States." 47 U.S.C. § 227(b)(1)(A)(iii). Under PHEAA's definition, such calls could only be made if the number to be called was generated randomly or sequentially. But again, this interpretation makes no sense because a debt-collection call is made to a specific person, presumably to collect a specific debt. Similarly, the TCPA exempts calls "made with the prior express consent of the called party," § 227(b)(1)(A), which again reflects Congress's assumption that an autodialed call can be made to a particular number. Both of these provisions reflect a meaning of autodialer that includes calls to be made from a preprogrammed list of numbers. See Marks, 904 F.3d at 1051 n.7 (listing "[o]ther provisions in the statute [that] prohibit[ ] calls to specified numbers").

The majority opinion tries to reconcile these provisions by pointing to the prohibition against using an autodialer to call "any emergency telephone line" including "any '911' line." § 227(b)(1)(A)(i). The majority says this provision would make no sense if the ATDS definition did not require some random or sequential generation. Maj. Op. at ——. However, the record of this case gives us no information about how random or sequential number generators work. Do these devices generate any conceivable phone number, or only numbers that are in service (i.e., numbers with valid area codes and leading digits)? And given that such a device presumably generates numbers with ten digits (including an area code), not three, would the random generation of a number with the area code "911" result in a call to an emergency 911 line, or would the call not go through (since "911" is, of course, not a valid area code)? I think it unwise to rest the interpretation of a federal statute on an unclear, hypothetical application of that law to a narrow and unique set of circumstances. [3]

Because we must "construe statutes in such a way to 'give effect, if possible, to every clause and word,' " S. Co. v. FCC, 293 F.3d 1338, 1346 (11th Cir. 2002) (quoting Williams v. Taylor, 529 U.S. 362, 404, 120 S. Ct. 1495, 1519, 146 L.Ed.2d 389 (2000)), the full context of § 227 supports the conclusion that PHEAA used an autodialer to call Ms. Evans.

3. Other Judicial Decisions

The majority says its restrictive interpretation of the statute is supported by several other courts. In ACA International v. FCC, 885 F.3d 687 (D.C. Cir. 2018), the D.C. Circuit struck down a 2015 FCC ruling in which the agency said a device's "capacity" includes its "potential functionalities." [4] Id. at 695. The D.C. Circuit's holding was partially based on its worry that, under an expansive definition of "capacity," every smartphone would qualify as an autodialer. See id. at 697–98. The majority raises this fear and even repurposes it: "Suddenly an unsolicited call using voice activated software (think Siri, Cortana, Alexa) or an automatic 'I'm driving' text message could be a violation worth $500." Maj. Op. at ––––. But what may have been a reasonable worry in ACA International doesn't exist here. Neither situation hypothesized by the majority involves the simultaneous dialing of numbers, plural. See § 227(a)(1). And making a call or sending a text message via voice command would almost certainly involve too much human intervention to qualify as being autodialed. See Marks, 904 F.3d at 1052–53; see also Duran v. La Boom Disco, Inc., 369 F. Supp. 3d 476, 490–92 (E.D.N.Y. 2019) (discussing other cases and holding that a device is not an autodialer if "a user determines the time at which" a message is sent), appeal filed, No. 19-600 (2d Cir. Mar. 8, 2019). The majority's concern is therefore misplaced.

*12 Meanwhile, the Third Circuit seems to have assumed that an autodialer must be able to generate random numbers. See Dominguez v. Yahoo, Inc., 894 F.3d 116, 120 (3d Cir. 2018). However, the court gave no analysis about how it arrived at this assumption, so I am not swayed by its conclusion. And it is true that some district courts agree with the majority's position, but it is also true that some do not. See, e.g., Gonzalez v. HOSOPO Corp., 371 F. Supp. 3d 26, 34 (D. Mass. 2019); Adams v. Ocwen Loan Serv., LLC, 366 F. Supp. 3d 1350, 1355 (S.D. Fla. 2018); see also Richardson v. Verde Energy USA, Inc., 354 F. Supp. 3d 639, 649–50 (E.D. Pa. 2018) (stating that, "were [it] writing on a blank slate," the court would hold for the plaintiff, but it was bound by Dominguez to hold otherwise).

The only Court of Appeals decision that addresses and grapples with the precise question before us is Marks, in which the Ninth Circuit held "that the statutory definition of ATDS includes a device that stores telephone numbers to be called, whether or not those numbers have been generated by a random or sequential number generator." 904 F.3d at 1043. The Marks court first found the text of § 227(a)(1)(A) to be ambiguous, and then concluded that the plaintiff's reading is preferable based on the surrounding provisions in the TCPA that allow an autodialer to call selected numbers. See id. at 1050–52. The majority says Marks was "a thoughtful opinion" but rejects it because the Ninth Circuit's reading of the statute "looks more like surgery ... than interpretation." Maj. Op. at –––– – ––––(quotation marks omitted). As I have already explained, this operation cannot be completed (to either side's satisfaction) without some minimally invasive procedures.

C. CONCLUSION

Happily, I think the majority is right to say that its decision does not declare open season for "telemarketers who wish to inundate citizens with solicitations and scams." See Maj. Op. at –––– – ––––. As this case demonstrates, the alternative method of liability for calls made using an artificial or prerecorded voice is not illusory. But while the sky is not necessarily falling, I think it unfortunate that the majority has closed the courthouse door to a broad swath of consumers who—like Ms. Evans—have suffered the very harm for which Congress provided recourse. I would affirm the District Court's grant of summary judgment to Ms. Evans.

II.

Because I would affirm the grant of summary judgment to Ms. Evans, I would hold PHEAA liable for all 35 calls she received. But although I am the odd man out as to PHEAA's liability for the entire universe of calls, I join the majority in affirming the District Court's finding of liability for the 13 calls that were made using a prerecorded voice (and the District Court's decision to treble damages on that basis).

**III.**

Finally, I concur in the majority's decision to affirm the grant of summary judgment to Hilton in Glasser v. Hilton Grand Vacations Co. I believe the majority is correct when it holds that there is too much human intervention in the Intelligent Mobile Connect system, which Hilton used to call Ms. Glasser, to qualify it as an autodialer. On this basis, I agree summary judgment was proper.

**All Citations**

--- F.3d ----, 2020 WL 415811

Footnotes

| | |
|---|---|
| * | Honorable Jeffrey S. Sutton, United States Circuit Judge for the Sixth Circuit, sitting by designation. |
| 1 | I agree with the majority that the last antecedent canon does not apply here. |
| 2 | The majority also says that under its reading of the TCPA, "[s]ometimes storage would happen; sometimes it wouldn't." Maj. Op. at ——. This raises another set of questions. Does storage always happen when a number is generated, thus undermining the majority's reading of the regulatory record? Or does it occur only when a number is made available for later dialing, something that would call into question the majority's otherwise broad reading of "store"? |
| 3 | Also, to the extent "any emergency line of a hospital, medical physician or service office, health care facility, poison control center, or fire protection or law enforcement agency" or "any guest room or patient room of a hospital," § 227(b)(1)(A)(i)–(ii), can be reached through a conventional phone number, it seems reasonable to assume such a call could come from a preprogrammed list just as easily as the number could be randomly generated. |
| 4 | My reading of the TCPA as a statutory matter renders it unnecessary to decide whether ACA International vacated all the FCC's TCPA-related rulings or just the 2015 order. See Golan v. FreeEats.com, Inc., 930 F.3d 950, 960 n.8 (8th Cir. 2019) ("We agree with the FCC not because we believe we are bound to do so but because we find this portion of their interpretation of the statute to be persuasive."). But I wish to note my disagreement with the majority's contention that the FCC's 1992 and 1995 TCPA-related orders answer the question before us. See Maj. Op. at ——. The 1992 order did not do anything more than restate the statutory definition of ATDS and note without analysis that certain calling features would "appear" not to be ATDS because they did not involve random or sequential number generation. In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 7 FCC Rcd. 8752, 8776–77 ¶ 47, 8792 (1992). The 1995 order, meanwhile, did not address the question before us at all; the substantive TCPA provision at issue there concerned only systems that use artificial or prerecorded voice messages, not autodialers. In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 10 FCC Rcd. 12,391, 12,400 ¶ 19 (1995) (citing 47 U.S.C. § 227(d)(3)(A)). |

**End of Document**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.